IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TEXAS NEIGHBORHOOD SERVICES<br>522 Palo Pinto Street<br>Weatherford, TX 76068<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>UNITED STATES DEPARTMENT OF<br>　HEALTH AND HUMAN SERVICES,<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201,<br><br>　　and<br><br>SYLVIA MATHEWS BURWELL, Secretary,<br>　U.S. Department of Health and<br>　Human Services,<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201,<br><br>　　　　Defendants. | Case No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Texas Neighborhood Services ("TNS") hereby files this Complaint against defendants United States Department of Health and Human Services ("HHS") and Sylvia Mathews Burwell in her official capacity as Secretary of HHS (collectively, "HHS" or "Agency"), and alleges as follows:

## JURISDICTION

1.　This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1361. Venue is proper under 28 U.S.C. § 1391(e). The declaratory and injunctive relief sought in this action is authorized by 28 U.S.C. §§ 2201-2202. Judicial review of HHS's action is authorized under 5 U.S.C. §§ 701-706, and TNS has exhausted all available administrative remedies.

## PARTIES

2. TNS is a not-for-profit corporation established under the laws of the State of Texas and exempt from federal income taxation pursuant to Section 501(c)(3) of the Internal Revenue Code of 1986. TNS has been designated as a Head Start agency within the meaning of the Head Start Act, 42 U.S.C. §§ 9831-9852c, since 1965. It currently provides Head Start and Early Head Start services to 1,185 children in the Texas counties of Palo Pinto, Parker, Erath, Somervell, Wise, Navarro, Hood, Jack, and Johnson.

3. Defendant HHS is statutorily charged with implementation of the federal Head Start and Early Head Start programs authorized under 42 U.S.C. §§ 9831-9852 ("Head Start Act"). Within HHS, the Administration for Children and Families ("ACF") administers and oversees the Head Start/Early Head Start program.

4. Defendant Sylvia Mathews Burwell is the Secretary of HHS and is therefore the official within the Executive Branch of the United States government ultimately responsible for carrying out the programs and activities of that Department. She is sued in her official capacity.

## STATEMENT OF FACTS

5. This case arises out of an HHS review of TNS's expenditure of Head Start grant funds performed between February 10 and February 15, 2013. That review resulted in findings that TNS was not in compliance with four regulations applicable to the Head Start and/or Early Head Start programs, and was based at least in part on inapposite documentation requested by HHS. On the basis of those findings, HHS determined that it would disallow $1,392,261.09 in charges to TNS's federal Head Start awards in the program years ending April 30, 2010, April 30, 2011, and April 30 2012.

6. HHS found, among other things, that TNS made improper incentive payments to employees in program years 2010, 2011, and 2012 in the amounts of $406,867, $589,191, and

2

$372,640, respectively. The HHS review report cited applicable cost principles in Office of Management and Budget Circular A-122 (codified at 2 C.F.R. Part 230) to the effect that:

> [i]ncentive compensation to employees based on cost reduction, or efficient performance, suggestion awards, safety awards, etc., are [sic] allowable to the extent that the overall compensation is determined to be reasonable and such costs are paid or accrued pursuant to an agreement entered into in good faith between the organization and the employees before the services were rendered, or pursuant to an established plan followed by the organization so consistently as to imply, in effect, an agreement to make such payment.

The review report then referred to TNS's duly-adopted incentive compensation policy, characterizing that policy as one providing that "[i]ncentive compensation [is] to be based on a plan of performance addressing the specific measures . . . to be achieved prior to payment of the incentive award."

7.   HHS determined that TNS did not ensure that its incentive payments were reasonable and did not adequately document the justification for such payments in the years at issue. Specifically, ACF observed that the payments were as much as $8,800 in 2010, $39,000 in 2011, and $25,000 in 2012. It further stated (1) that there was no support showing how employees were scored or how the incentive amounts were determined, and (2) TNS was unable to locate or provide "individual plans of performance" to support the incentive awards during the years in question.

8.   By letter dated September 19, 2013, HHS notified TNS that it intended to disallow all but $36,000 of the incentive compensation finding (*i.e.*, net $1,332,698.09). HHS repeated the statements in the review report regarding lack of support for awards, but added that the incentive awards were otherwise unreasonable "in total based on the high percentage of total incentive payments versus total salary costs, and . . . on a per individual basis for some administrative staff that received [as much as] $39,000 each in 2012 and $25,000 each in 2011."

3

9. TNS timely appealed the September 19, 2013 disallowance letter to the HHS Departmental Appeals Board ("DAB") on October 15, 2013.

10. In the course of that appeal, TNS argued that the incentive compensation disallowance is erroneous as a matter of both law and fact as TNS's policy for employee incentive awards and its expenditures pursuant to that policy meet the requirements for allowability under OMB Circular A-122.

11. TNS demonstrated that it has had in place a formal policy governing incentive compensation for TNS personnel since no later than 2007. The intent of the policy is to permit staff "to receive increases in salary for consistent or exemplary job performance in the form of incentive awards paid to individuals pursuant to an incentive plan approved by the Executive Director of TNS." The policy directs TNS senior staff to develop a "plan of performance" setting forth criteria for eligibility for incentive payments and "defin[ing] the measures [*e.g.*, cost reduction, efficient performance, *etc.*] that must be achieved prior to payment of any incentive award." *Id.*

12. TNS further demonstrated that it had created such a "plan of performance" according to the policy guidelines and obtained board approval of that plan on October 22, 2009. The plan sets a goal of operating at 95% of TNS's approved annual Head Start budget through a combination of "cost reductions, cost management and efficient purchasing processes." Savings realized under this strategy can be devoted to an incentive plan to recognize employee contributions to the organization. Awards made under the plan are to be determined according to a scoring system based on certain assessment tools, employee performance appraisals, disciplinary history, and discretionary input from supervisors. Any incentive payments to TNS's Executive Director must be authorized by the President of the Board of Directors, and awards to

any employee are subject to the Head Start statutory cap on total compensation and other tests of reasonableness.

13. TNS pointed to evidence showing that the incentive payments made during the fiscal years ending April 30, 2010, April 30, 2011, and April 30, 2012 (totaling $401,795.52, $620,250.00, and $343,961.04, respectively) were determined according to the scoring matrix referenced in the performance plan. Individuals were given a letter grade of A, B, C, or D, with the award amount varying according to performance grade (A's receive more than B's, B's more than C's, and D's receiving no award) and employee level/type. As required by the performance plan, all incentive payments to the Executive Director were approved in writing by the board President.

14. As to HHS's contention that the incentive awards were otherwise unreasonable "in total based on the high percentage of total incentive payments versus total salary costs, and . . . on a per individual basis," TNS offered evidence that it had caused a wage comparability study to be performed in 2009 by which to gauge the reasonableness of individual employee compensation payments. That study showed that total remuneration – including incentive awards – to individuals charged in whole or in part to TNS's Head Start grant was within the ranges paid to persons similarly-situated in terms of both geography and job description.

15. On May 12, 2014, the DAB issued its decision in TNS's appeal wherein it upheld the full amount of the disallowance.

16. The DAB found with respect to the incentive compensation issue that TNS had failed to follow its own policies and that it had not adequately documented the bases for individual incentive awards. In addition, the DAB faulted TNS for not recognizing that HHS's insistence on documentation of "individual plans of performance" was in reference to employee

scoring results rather than the "plan of performance" within the meaning of TNS's incentive compensation policy.

17. The DAB likewise agreed with HHS that the incentive payments were unreasonable based in part on its view that the amounts were determined "in what appears to be an arbitrary manner."

18. TNS requested reconsideration of the DAB's decision on May 27, 2014. TNS argued that the DAB's ruling improperly relied on grounds not presented in HHS's decision letters or appeal filings, that it imposed documentation standards in excess of what the law requires, and that it disregarded prior DAB decisions setting forth the criteria for determining the reasonableness of employee compensation.

19. The DAB denied TNS's reconsideration request on July 8, 2014.

## CAUSES OF ACTION

### COUNT I

**ADMINISTRATIVE PROCEDURE ACT:**
**Agency Action as Arbitrary, Capricious, and/or Contrary to Law**

20. TNS realleges and incorporates by reference herein paragraphs 1 through 19, above.

21. The decision to disallow $1,332,698.09 in incentive compensation charged to TNS's Head Start award is arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

22. The decision ignores record evidence presented by TNS during HHS's review process demonstrating that TNS documented the incentive compensation charges in accordance with the cost principles in OMB Circular A-122.

23. The decision imposes on TNS recordkeeping and documentation obligations that are contrary to law.

24. The decision disregards and is contrary to prior rulings in administrative appeals binding on HHS.

**PRAYER FOR RELIEF**

25. **NOW, THEREFORE**, TNS requests that this Court:

    A. Declare that HHS's bases for disallowing the incentive compensation charges to TNS's Head Start grant are unlawful and arbitrary and capricious.

    B. Declare that the DAB's decision to uphold the disallowance is itself unlawful and arbitrary and capricious.

    C. Reverse the HHS and DAB disallowance decisions as they relate to TNS's incentive compensation payments or, in the alternative, vacate those decisions and remand to HHS with instructions to apply the correct legal standards and consider the relevant evidence of record.

    D. Award TNS its costs and attorneys fees incurred in the prosecution of this action.

    E. Grant such other relief as the Court deems warranted and just.

Respectfully submitted,

/s/

Edward T. Waters (DC Bar No. 422461)
Robert A. Graham (DC Bar No. 450345)
FELDESMAN TUCKER LEIFER FIDELL LLP
1129 20th Street, N.W., Fourth Floor
Washington, D.C. 20036
(202) 466-8960 (telephone)
(202) 293-8103 (facsimile)
ewaters@ftlf.com
rgraham@ftlf.com