# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

)
TEXAS NEIGHBORHOOD SERVICES, )
)
Plaintiff, )
)
v. )          Civil Action No. 14-cv-1545 (TSC)
)
UNITED STATES DEPARTMENT OF )
HEALTH AND HUMAN SERVICES; )
and SYLVIA M. BURWELL, Secretary, )
)
Defendants. )
)

## MEMORANDUM OPINION

Plaintiff Texas Neighborhood Services ("TNS") brings this action under the

Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* (the "APA").  TNS alleges that the United

States Department of Health and Human Services ("HHS")[1] violated section 706(2)(A) of the

APA when one of its divisions, the Administration for Children and Families ("ACF")[2]

disallowed approximately $1.3 million in incentive compensation charged to TNS's Head Start

awards for fiscal years 2010, 2011 and 2012 ("FY 2010," "FY 2011" and "FY 2012").

TNS moves for summary judgment pursuant to Federal Rule of Civil Procedure 56.

It argues that Defendant's decision to disallow the aforementioned charges was arbitrary and

---

[1] Secretary of HHS Sylvia Burwell is sued in her official capacity.  (*See* Compl. ¶ 4).  Given the well-established principle that a suit against a public official in her official capacity "is not a suit against the official but rather is a suit against the official's office," this Memorandum Opinion will refer to HHS as the sole Defendant in this action.  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *see also Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").

[2] Unless otherwise noted, references to "Defendant" will encompass HHS, ACF and HHS's Departmental Appeals Board (the "Board").

capricious, contrary to law, and an abuse of discretion because (i) the decision by the Board

upholding the disallowance was based on different grounds than Defendant's initial disallowance

decision; (ii) the disallowance decision is contrary to Defendant's prior interpretations of the

relevant cost principles; and (iii) Defendant failed to differentiate between proper and improper

incentive payments during the fiscal years in question, instead disallowing across the board all

incentive payments made during those years.  Defendant cross-moves for summary judgment,

arguing that the administrative record supports the disallowance of the aforementioned charges,

and that TNS's arguments to the contrary are without merit.

Upon consideration of the parties' briefs, and for the reasons set forth below, TNS's

motion is hereby **DENIED** and Defendant's cross-motion is hereby **GRANTED.**

## I.     BACKGROUND

TNS is a private non-profit organization that provides community services, including

Head Start and Early Head Start services, to children in nine Texas counties.  Non-profit

organizations that receive federal grants, including Head Start grants, are subject to the cost

principles in Office of Management and Budget Circular A-122, which are now codified at

45 C.F.R. § 75.400 *et seq.* (the "Cost Principles").[3]  The Cost Principles provide that a cost is

allowable under a federal award if, among other things, it is necessary and reasonable for the

performance of the award, allocable thereto and adequately documented.  *See id.* § 75.403.

The Cost Principles also state as follows with regard to incentive compensation:

> Incentive compensation to employees based on cost reduction, or efficient
> performance, suggestion awards, safety awards, etc., is allowable to the extent that
> the overall compensation is determined to be reasonable and such costs are paid or

---

[3] When TNS's challenge to the disallowance decision at issue in this case was pending before
the Board, the Cost Principles were codified at 2 C.F.R. Part 230.  That part has since been
superseded.  *See* 45 C.F.R. § 75.104(a)(6).  This Memorandum Opinion will refer only to the
present codification of the Cost Principles and any other relevant federal regulations.

accrued . . . pursuant to an established plan followed by the [organization] so consistently as to imply, in effect, an agreement to make such payment.

*Id.* § 75.430(f).[4]

The Cost Principles further provide that a "cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost." *Id.* § 75.404.  Consideration must be given to the following factors, among others, in determining the reasonableness of a given cost:

- "Whether the cost is of a type generally recognized as ordinary and necessary for the operation of the [organization] or the proper and efficient performance of the Federal award";

- "Market prices for comparable . . . services for the geographic area";

- "Whether the individuals concerned acted with prudence in the circumstances considering their responsibilities"; and

- "Whether the [organization] significantly deviates from its established practices and policies regarding the incurrence of costs."

*Id.*  If an organization "fails to comply with Federal statutes, regulations, or the terms and conditions of a Federal award," an awarding agency is permitted, among other things, to "[d]isallow (that is, deny both use of funds and any applicable matching credit for) all or part of the cost of the activity or action not in compliance." *Id.* § 75.371(b).

---

[4] The Cost Principles also provide that incentive compensation awards are allowable to the extent that they are paid "pursuant to an agreement entered into in good faith between the [organization] and the employees before the services were rendered."  45 C.F.R. § 75.430(f). Since neither party contends that such a formal agreement exists here, however, the court's discussion of section 75.430(f) will focus only on whether the challenged incentive compensation awards were made "pursuant to an established plan followed by the [organization] so consistently as to imply, in effect, an agreement to make such payment." *Id.*

In 2007, TNS instituted an incentive compensation policy (the "2007 Policy"), the purpose of which was "to allow TNS personnel to receive increases in salary for consistent or exemplary job performance in the form of incentive awards paid to individuals pursuant to an incentive plan approved by the Executive Director of TNS."  (J.A. 136).[5]  The 2007 Policy also set forth a number of "Guidelines."  One Guideline states:

> To be eligible for incentive compensation awards, TNS managerial staff must present to the TNS Executive Director a plan of performance, which defines the measures that must be achieved prior to payment of any incentive award.  The specific measures may include, but [are not] limited to, cost reduction, efficient performance, safety awards, or other types of measure[s] identified in the performance plan.

(*Id.*).  Other Guidelines provide that, "[t]o be eligible to receive incentive compensation, employees must not have received verbal or written performance warnings within 90 days of the payment of the incentive," and that "[f]or employees that have been with TNS more than one year, a current employee evaluation with a satisfactory evaluation must be on file."  (*Id.*).

In 2009, TNS instituted the "plan of performance" referenced in the 2007 Policy (the "2009 Plan").  (J.A. 138-42).  The 2009 Plan states that "TNS recognizes [that] some of its employees are higher performers than other employees in similar positions and wishes to compensate those higher performing employees in a manner [commensurate] with their contributions to the organization."  (J.A. 139).  It also states that

> it is the plan of the TNS board of directors to direct the Executive Director to operate the grants at approx. 95% of full funding by implementing a system of cost reductions, cost management and efficient purchasing processes.  Should the management of TNS be successful in operating the programs efficiently, then all staff will be able to share in an incentive plan to help the agency achieve fair and reasonable compensation for all employees.

(*Id.*).  The 2009 Plan further provides that "[n]ot all incentive compensation should be paid at the

---

[5] Citations to "J.A. __" refer to the Joint Appendix filed by the parties in this case.

same percentage of annual salary," and that "[i]ncentives for superior work performance should be higher than for average or below average performers." (*Id.*).  It also dictates that "[n]o employee compensation will be in excess of the Level II Executive Compensation set by the Federal Government at the time of the payment," and that "[t]otal compensation for all employees will not exceed the maximum compensation for that position" as determined by a wage comparability study prepared for TNS.  (*Id.*).  Additionally, the 2009 Plan contains an appendix with a matrix for TNS to follow in "determining employee worth to the organization" when deciding on incentive compensation awards.  (J.A. 139, 141-42).[6]  Lastly, the 2009 Plan explicitly states that TNS will follow the Cost Principles in making incentive compensation awards.  (J.A. 139-40).

In February 2013, Defendant conducted a triennial monitoring review of TNS's expenditure of Head Start grant funds in FY 2010, FY 2011 and FY 2012.  (J.A. 123-25).  That review led to an April 2013 monitoring report in which Defendant determined that TNS was out of compliance with the Cost Principles (the "Monitoring Report").  (J.A. 123-30).  The

---

[6] Additionally, as the Board noted, the 2009 Plan's matrix appears to be inconsistent with the 2007 Policy:

> [T]he [2007 Policy] provides that in order to be eligible to receive incentive compensation, employees "must not have received verbal or written performance warnings within 90 days of the payment of the incentive."  Yet, one of the rating criteria in the matrix for every type of employee is the employee's history of "[d]isciplinary actions and write-up for issues."  Employees with no disciplinary actions or write-ups receive 100% of the allotted points for that criterion (10-20 points, depending on the type of employee), employees with one disciplinary action or write-up receive 50% of the allotted points, and employees with two or more disciplinary actions or write-ups receive 0% of the allotted points. There is nothing in the matrix indicating that an employee could not qualify for incentive compensation if a performance warning was received within 90 days of the date the compensation would be paid.

(J.A. 4 n.2) (citations to administrative record omitted).

Monitoring Report stated that TNS "did not ensure incentive compensation payments to employees were allowable to the extent the overall compensation was determined to be reasonable," and that TNS "was unable to document the basis for amounts awarded as incentive compensation." (J.A. 127).[7]

In September 2013, Defendant sent TNS a letter disallowing $1,332,698.09 in unsupported incentive payments for FY 2010, FY 2011 and FY 2012 pursuant to the Cost Principles (the "Disallowance Letter") (J.A. 23-26). The Disallowance Letter reiterated the findings in the Monitoring Report, stating that the incentive compensation payments made during these three years were unreasonable and insufficiently supported. (J.A. 23-24). Specifically, it stated that "there was no support to indicate which employee met the requirements of which band of [performance measure] criteria, nor how much would be paid per employee for meeting each band," and that "the amounts paid out as 'incentives' were unreasonable in total based on the high percentage of total incentive payments versus total salary costs, and unreasonable on a per individual basis for some administrative staff." (*Id.*).[8]

---

[7] As the parties point out in their briefs, the Monitoring Report makes a reference to "plans of performance" which is somewhat confusing. The 2007 Policy requires the presentation to the TNS Executive Director of "a plan of performance" defining "the measures that must be achieved prior to payment of any incentive award." (J.A. 136). The 2009 Plan is, in fact, that "plan of performance." (J.A. 138-42). The Monitoring Report, however, uses the phrase "plans of performance" to describe missing individualized documentation supporting the incentive compensation that TNS awarded to its employees in the subject years. (*See* J.A. 127-28) (stating that "[t]he grantee was unable to document the basis for amounts awarded as incentive compensation" and that "individual plans of performance" were needed "to support payments to employees receiving incentive compensation"). Confusing nomenclature aside, the Monitoring Report nevertheless makes clear that Defendant determined that TNS had failed "to document the basis for amounts awarded as incentive compensation." (*Id.*).

[8] The Disallowance Letter echoes the Monitoring Report's use of the term "plans of performance," discussed *supra*. As with the Monitoring Report, however, the Disallowance Letter makes clear that the disallowance was based, in part, on TNS's failure to provide adequate documentary support for the challenged incentive compensation awards.

TNS timely appealed Defendant's disallowance decision to the Board.  Board precedent

establishes that, under the applicable regulations and Cost Principles, "a grantee bears the burden

of documenting the existence and allowability of its expenditures of federal funds." *Touch of*

*Love Ministries, Inc.*, DAB No. 2393, 2011 WL 3251319, at *3 (2011) (citing *Benaroya*

*Research Inst.*, DAB No. 2197, 2008 WL 4338767, at *2 (2008) (collecting cases)); *see also*

*Recovery Res. Ctr., Inc.*, DAB No. 2063, 2007 WL 522127, at *8 (2007) ("Being able to account

for the expenditure of federal funds is a central responsibility of any grantee.") (citations

omitted).  Thus, "[o]nce a cost is questioned as lacking documentation, the grantee bears the

burden to document, with records supported by source documentation, that the costs were

actually incurred and represent allowable costs, allocable to the grant." *Northstar Youth Servs.*,

DAB No. 1884, 2003 WL 21801698, at *3 (2003) (citations omitted).

The Board issued its decision in May 2014.  It found that Defendant "properly disallowed

incentive compensation payments that TNS ha[d] not established are reasonable, supported by

adequate documentation, and made pursuant to a pre-existing agreement or established plan."

(J.A. 3).  TNS subsequently moved the Board to reconsider, making the same three arguments

that it makes in this litigation.  (J.A. 87-100).  In July 2014, the Board ruled that TNS had failed

to show a clear error of fact or law in the Board's decision, and declined to reconsider.  (J.A.

14-20).  TNS then commenced the instant litigation.

## II.   LEGAL STANDARDS

### A.  The Administrative Procedure Act

Under the APA, a reviewing court must set aside an agency action that is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

§ 706(2)(A).  "[T]he party challenging an agency's action as arbitrary and capricious bears the

burden of proof."  *San Luis Obispo Mothers for Peace v. U.S. Nuclear Regulatory Comm'n*, 789

F.2d 26, 37 (D.C. Cir. 1986) (en banc).  This court's limited function in reviewing a final agency action under the APA is "to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Kaiser Found. Hosps. v. Sebelius*, 828 F.Supp. 2d 193, 198 (D.D.C. 2011) (quotation and citations omitted); *see also Zevallos v. Obama*, 793 F.3d 106, 112 (D.C. Cir. 2015).

The scope of review under the arbitrary and capricious standard is "'highly deferential.'" *Zevallos*, 793 F.3d at 112 (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)).  The scope of review is also "narrow," such that a court "is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Yet,

> courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking.  When reviewing an agency action, [a court] must assess, among other matters, "'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'"  That task involves examining the reasons for agency decisions – or, as the case may be, the absence of such reasons.

*Judulang v. Holder*, 132 S. Ct. 476, 483-84 (2011) (quoting *State Farm*, 463 U.S. at 43) (itself quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)); *see also Pharm. Research & Mfrs. of Am. v. F.T.C.*, 790 F.3d 198, 209 (D.C. Cir. 2015) ("The touchstone of arbitrary and capricious review is reasoned decisionmaking.") (citation and alteration omitted).

Simply put, "the agency must explain why it decided to act as it did."  *Butte Cty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).  But this explanation need not be "a model of analytic precision to survive a challenge."  *Coburn v. McHugh*, 679 F.3d 924, 934 (D.C. Cir. 2012) (quotation omitted).  Rather, a reviewing court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Bowman Transp.*, 419 U.S. at 286

(citation omitted).  Thus, a reviewing court "will not disturb the decision of an agency that has 'examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"  *MD Pharm., Inc. v. Drug Enforcement Admin.*, 133 F.3d 8, 16 (D.C. Cir. 1998) (quoting *State Farm*, 463 U.S. at 43).

   B.   <u>Summary Judgment</u>

   Summary judgment is an appropriate mechanism for a district court to determine whether, as a matter of law, an agency's decision "is supported by the administrative record and otherwise consistent with the APA standard of review."  *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007) (citation omitted); *see also Deppenbrook v. Pension Benefit Guar. Corp.*, 778 F.3d 166, 171 (D.C. Cir. 2015) (stating that a district court's grant of summary judgment to an agency should be upheld so long as the agency met the APA's arbitrary and capricious standard).  When reviewing an agency's action, the "entire case on review is a question of law," *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (quotation omitted), and a district court generally may not look outside of the administrative record.  5 U.S.C. § 706; *see also Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("In applying that standard, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013) ("[I]t is black-letter administrative law that in an APA case, a reviewing court 'should have before it neither more nor less information than did the agency when it made its decision.'") (quoting *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984)).

   In an APA case such as this one, summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247-48 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). Summary judgment may be rendered on a "claim or defense . . . or [a] part of each claim or defense." Fed. R. Civ. P. 56(a).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination. An issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Holcomb*, 433 F.3d at 895 (quoting *Liberty Lobby*, 477 U.S. at 248) (citation omitted). The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified." *Taxpayers Watchdog, Inc., v. Stanley*, 819 F.2d 294, 297 (D.C. Cir. 1987).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty Lobby*, 477 U.S. at 255; *see also Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006) ("We view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor."). The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials, and must be supported by affidavits, declarations or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). The

non-movant is "required to provide evidence that would permit a reasonable jury to find" in his

favor. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

## III.   ANALYSIS

Incentive compensation awards such as the ones at issue in this litigation are allowable

under the Cost Principles insofar as they are "adequately documented," 45 C.F.R. § 75.403(g),

"determined to be reasonable," and paid "pursuant to an established plan followed by [an

organization] so consistently as to imply, in effect, an agreement to make such payment." *Id.*

§ 75.430(f).  The Board found that TNS "failed to show that its incentive compensation awards

were reasonable," "failed to follow its policies related to incentive compensation and did not

provide adequate documentation to support its incentive compensation awards."  (J.A. 3, 9).

Given the court's limited role in reviewing a final agency action under the APA, and the narrow,

deferential scope of that review, the court finds that TNS has not met its burden of establishing

that the disallowance decision was "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law."  5 U.S.C. § 706(2)(A).

> A.  The Board's Decision Upholding The Disallowance Decision Was
>     Based On The Same Grounds As The Initial Disallowance Decision

TNS argues that the grounds for disallowance were different as between the

Disallowance Letter and the Board's decision and that, as a result, it was not provided with

adequate notice as to the ultimate basis for the disallowance decision.  (*See* Pl.'s Br. at 10-14).

The court disagrees, and finds that the Board's decision is consistent with the Disallowance

Letter.  For example, the Disallowance Letter states that TNS "was unable to document the basis

for amounts awarded as incentive compensation," and that TNS's incentive compensation

awards for FY 2010, FY 2011 and FY 2012 were "unreasonable and unallowable due to lack of

support."  (J.A. 23).  The Board's decision was based in large part on the same grounds – *i.e.*,

that TNS "failed to show that its incentive compensation awards were reasonable" and "did not provide adequate documentation to support its incentive compensation awards."  (J.A. 3, 9).[9]

TNS contends, however, that the Board "*sua sponte* based its decision on the supposed absence of documentation not addressed in [the Disallowance Letter], thus depriving [it] of the opportunity [to] address the reasoning underlying the final agency action."  (Pl.'s Br. at 11). TNS essentially argues that, because the Disallowance Letter did not explicitly state that it needed to support the challenged incentive compensation awards with ***employee-specific*** documentation, it should not be faulted for failing to provide the Board with such documentation. (*See id.* at 11-14).  The court finds a number of flaws in this argument.

First, TNS overlooks the fact that the Board did not base its decision solely on the lack of employee-specific documentation.  The Board also found that the incentive compensation awards at issue in this litigation were unreasonable, and that they had not been made pursuant to TNS's 2007 Policy and 2009 Plan.  (*See* J.A. 8-9).

Second, TNS's argument ignores the well-settled principle that, "[o]nce a cost is questioned as lacking documentation, the grantee bears the burden to document, with records

---

[9] The Board's decision also found that TNS "failed to follow its policies related to incentive compensation" (J.A. 3), thereby violating the Cost Principles' requirement that incentive compensation be paid "pursuant to an established plan followed by the [organization] so consistently as to imply, in effect, an agreement to make such payment."  45 C.F.R. § 75.430(f). While the Disallowance Letter did not make the same finding regarding TNS's failure to follow its own policies, this would seem to stem from the fact that many, if not all, of the documents upon which the Board based this finding were only provided to it ***after*** the Disallowance Letter was issued.  (*See, e.g.*, Pl.'s Br. at 12) (noting that TNS produced certain charts of employee pay information and the 2009 Plan "[i]n its submissions to the [Board]").  The court therefore does not take issue with this minor divergence between the Disallowance Letter and the Board's decision, which, in any event, is not challenged by TNS.  The court also notes that the extent to which an organization "deviates from its established practices and policies regarding the incurrence of costs" is part of the reasonableness calculus under the Cost Principles, and that the Disallowance Letter clearly stated that the challenged incentive compensation awards were unreasonable.  45 C.F.R. § 75.404(e).

***supported by source documentation***, that the costs were actually incurred and represent allowable costs, allocable to the grant." *Northstar*, 2003 WL 21801698, at *3 (citations omitted) (emphasis added).  While TNS provided certain pay records to the Board, it simply did not support those records with the requisite "source documentation." *Id.*[10]

Third, TNS marshals no authority to support the proposition that Defendant was required to specify precisely which documents were needed to support its incentive compensation awards. The Disallowance Letter stated that the challenged incentive compensation awards were "unallowable due to lack of support," and that "there was no support to indicate which employee met the requirements of which band of [performance measure] criteria, nor how much would be paid per employee for meeting each band." (J.A. 23-24).  The court finds that this sufficed to put TNS on notice regarding the need to provide source documentation to support the challenged awards.

Fourth, TNS ignores its own 2007 Policy, which requires, among other things, that, "[f]or employees that have been with TNS more than one year, a current employee evaluation with a satisfactory evaluation must be on file," and that, in order "[t]o be eligible to receive incentive compensation, employees must not have received verbal or written performance warnings within 90 days of the payment of the incentive." (J.A. 136).  Despite these requirements, TNS did not

---

[10] TNS has appended "more than 2,000 pages showing application of the incentive pay matrix for individual employees for 2010 through 2012" to its reply brief.  (Pl.'s Reply Br. at 9).  This would appear to be the missing source documentation for the challenged incentive compensation awards.  As these documents are not part of the administrative record in this case, and as TNS has not established that the court may review such "extra-record" materials here, the court will not consider them.  *See, e.g.*, *Nat'l Min. Ass'n v. Jackson*, 856 F. Supp. 2d 150, 156-57 (D.D.C. 2012) (setting forth four exceptions rendering extra-record evidence reviewable by reviewing court in APA cases, none of which are applicable here) (citing *IMS, P.C. v. Alvarez*, 129 F.3d 618, 624 (D.C. Cir. 1997); *Cape Hatteras Access Pres. Alliance v. U.S. Dep't of Interior*, 667 F.Supp. 2d 111, 115-16 (D.D.C. 2009)).

provide Defendant with employee evaluations to support its incentive compensation awards, nor did it provide any records establishing that the employees who received such awards had not received any performance warnings within 90 days of receiving those awards.  TNS cannot plausibly argue that it did not know what was required to adequately document the challenged incentive compensation awards when *its own 2007 Policy* provided it with the requisite notice.

Fifth, TNS overlooks the fact that the Disallowance Letter cited specific examples of individual employees whose incentive compensation Defendant considered unreasonable.  (*See*, *e.g.*, J.A. 23-24) ("the amounts paid out as 'incentives' were . . . unreasonable on a per individual basis for some administrative staff that received incentive payments as high as $39,000 each in 2012 and $25,000 each in 2011").  This should have put TNS on notice regarding the need to rebut such individualized findings with similarly individualized documentation.

Sixth, Defendant raised the need for employee-specific documentation in its response brief before the Board.  Among other things, Defendant (i) attacked TNS's claim "that it was not required to document individual performance" (J.A. 49); (ii) argued that TNS had not sufficiently documented the challenged incentive compensation awards in part because it "failed to have specific documentation of how the employees' performance was measured and how much would be paid to each employee" (*id.*); and (iii) pointed out the absence of any "individual performance evaluations indicating the employees' contribution to the program" (J.A. 51).  Thus, at the very latest, TNS was aware of Defendant's position regarding the need for employee-specific documentation prior to filing its reply brief before the Board, and was by no means "depriv[ed] . . . of the opportunity [to] address the reasoning underlying the final agency action." (Pl.'s Br. at 11).

For all of these reasons, the court rejects TNS's argument that Defendant failed to provide it with adequate notice regarding the grounds for its disallowance decision prior to the issuance of the Board's decision.

### B. The Board's Determination That TNS Failed To Follow The 2007 Policy And 2009 Plan Was Not Arbitrary, Capricious, Contrary To Law Or An Abuse Of Discretion

The Cost Principles provide that incentive compensation awards are allowable insofar as they are made "pursuant to an established plan followed by the [organization] so consistently as to imply, in effect, an agreement to make such payment."  45 C.F.R. § 75.430(f).  Together, the 2007 Policy and 2009 Plan form the requisite "established plan."  As noted above, the 2007 Policy provides that in order "[t]o be eligible to receive incentive compensation, employees must not have received verbal or written performance warnings within 90 days of the payment of the incentive." (J.A. 136).  It also states that, "[f]or employees that have been with TNS more than one year, a current employee evaluation with a satisfactory evaluation must be on file." (*Id.*). The 2009 Plan provides that "[n]ot all incentive compensation should be paid at the same percentage of annual salary," and that "[i]ncentives for superior work performance should be higher than for average or below average performers." (J.A. 139).  As mentioned above, the 2009 Plan also contains an appendix with a matrix for "determining employee worth to the organization" to be used in calculating incentive compensation awards. (J.A. 139, 141-42).

The Board determined that the challenged incentive compensation awards did not follow the requirements set out in the 2007 Policy and 2009 Plan "so consistently as to imply, in effect, an agreement to make such" awards.  45 C.F.R. § 75.430(f).  Specifically, for FY 2010, the Board found that non-management employees "received the same rate of incentive compensation, equal to 160 hours of his or her unit pay hourly rate." (J.A. 5).  Citing the 2009 Plan's statements that (i) "[n]ot all incentive compensation should be paid at the same percentage

of annual salary"; (ii) "[i]ncentives for superior work performance should be higher than for average or below average performers"; and (iii) TNS "will follow a matrix for determining employee worth to the organization," the Board concluded that "paying all non-management employees the same level of incentive compensation without taking into account individual employee performance . . . directly conflicted with TNS's incentive compensation policies. Those awards, therefore, were not made pursuant to TNS's 'established plan' for incentive compensation, in violation of the cost principles."  (J.A. 5-6).

The Board also noted that some management employees "received less generous incentive compensation awards, both in terms of actual money awarded and in terms of the award as a percentage of their annual salaries, than did employees with lower or equivalent ratings" in FY 2010.  (J.A. 6).  The Board found that this "call[ed] into question whether TNS actually used the ratings to determine the amount of incentive compensation awarded," as the 2009 Plan required, and that none of the records produced by TNS adequately explained these inconsistent awards.  (*Id.*).  The Board also took issue with TNS's failure to provide the FY 2010 performance evaluations that the 2007 Policy required it to keep on file or any records about its employees' disciplinary histories, which the 2007 Policy also deemed relevant.  (*Id.*).[11]

Similarly, for FY 2011, the Board found that some of TNS's employees "received less generous incentive compensation awards, both in terms of actual money awarded and in terms of the award as a percentage of their annual salaries, than did employees with lower or equivalent grades," and that TNS "did not provide any employee-specific documentation substantiating"

---

[11] The Board also found that TNS failed to produce certain memoranda that it was required to place "in its employees' files to document that payment of an incentive compensation award was pursuant to the factors in the plan."  (J.A. 7).  The court agrees with TNS, however, that the "memoranda referenced at pages 10 through 12 of [Defendant's] opening brief are precisely the 'memoranda' that [Defendant] claims to be missing."  (Pl.'s Reply Br. at 10).

these inconsistent payments, neither of which was in keeping with the 2007 Policy and 2009 Plan. (J.A. 7). As to FY 2012, the Board found that TNS "failed to provide documentation to substantiate the determination that certain non-management employees met the qualifications to receive incentive compensation or to justify the varying amounts that they received as awards," and "failed to provide documentation substantiating the ratings given to management employees," some of whom "received less generous incentive compensation awards, both in terms of actual money awarded and in terms of the award as a percentage of their annual salaries, than did employees with lower or equivalent grades and ratings." (J.A. 8). The Board also pointed out that one employee who received a "C-/D+" grade was nevertheless paid incentive compensation, which it considered "difficult to reconcile" with the 2007 Policy's provision that incentive compensation was intended to reward "consistent or exemplary performance." (*Id.*).

In the court's view, the Board's determination that TNS failed to follow the 2007 Policy and 2009 Plan "so consistently as to imply, in effect, an agreement to make" the challenged incentive compensation awards was not arbitrary, capricious, contrary to law or an abuse of discretion. 45 C.F.R. § 75.430(f). The 2009 Plan required TNS to pay incentive compensation to its employees at different rates depending on the quality of their work performance. The record demonstrates that this was not done for non-management employees in FY 2010, as they all received the same rate of incentive compensation. The record also calls into question whether TNS's employees were compensated according to the quality of their work performance in *any* of the challenged fiscal years, as each year saw lower-rated employees receiving more generous incentive compensation than higher-rated employees. Nothing in the administrative record explains these inconsistencies. Additionally, the 2007 Policy required TNS to keep on file employee evaluations supporting incentive compensation awards, and to ensure that such awards

were not paid to any employees who had recently received a performance warning.  It was therefore not arbitrary, capricious, contrary to law or an abuse of discretion for the Board to require TNS to produce evaluations for employees who received incentive compensation and/or records demonstrating that such employees had not recently received a performance warning, which TNS failed to do.

TNS argues that it "followed the plain wording of its policies in the same fashion as grantees previously found to be in compliance with the cost principles."  (Pl.'s Br. at 18-19).  In support of its FY 2010 incentive compensation awards, where non-management employees all received the same rate of incentive compensation, TNS points to *Washington Cty. Opportunities, Inc.*, DAB No. 1464, 1994 WL 321795 (1994), in which the Board upheld "across-the-board incentive payments made evenly to all the organization's employees."  (*Id.* at 19).  But TNS's argument overlooks the fact that its own 2009 Plan explicitly states that "[n]ot all incentive compensation should be paid at the same percentage of annual salary," and that "[i]ncentives for superior work performance should be higher than for average or below average performers." (J.A. 139).  As Defendant points out in its cross-motion, the organization in *Washington County Opportunities* did not have any policies requiring such individualized incentive compensation awards.  (*See* Def.'s Br. at 20-21).  TNS, however, does not address this important distinction in its reply brief.

As to FY 2011 and FY 2012, TNS argues that Defendant "makes no claim that [it] failed, on the whole, to follow its policy.  Rather, [the Board's] decision in fact only vaguely references 'some' employees who received inconsistent payments, and specifically references only a single management employee who received an arguably improper award."  (Pl.'s Br. at 21) (citation omitted).  But aside from minimizing the many issues with the subject awards that Defendant has

raised, this argument overlooks the fact that the inconsistencies cited by the Board, which persist across all the fiscal years in question, clearly demonstrate that TNS did not make the challenged awards pursuant to an established plan that it followed "***so consistently as to imply, in effect, an agreement to make such payment***." 45 C.F.R. § 75.430(f) (emphasis added). To the contrary, these inconsistencies demonstrate that TNS "determine[d] incentive awards in what appears to be an arbitrary manner." (J.A. 11). This is all that is needed to support the disallowance.

Moreover, TNS misreads the Board's decision, which was not based solely on a few employees receiving inconsistent payments. The Board also determined that TNS failed to produce (i) records sufficient to substantiate **<u>any</u>** of its incentive compensation awards for the subject years, including documents justifying the apparently inconsistent awards; (ii) evaluations for employees who received incentive compensation awards during the fiscal years in question, even though the 2007 Policy required it to keep such evaluations on file; or (iii) records demonstrating that such employees had not received a performance warning within 90 days of receiving such awards. Simply put, TNS has not pointed to anything in the administrative record demonstrating that these findings were arbitrary, capricious, contrary to law or an abuse of discretion.

For these reasons, the court finds that the Board's determination that TNS failed to follow its own incentive compensation plan was not arbitrary, capricious, contrary to law or an abuse of discretion.

C. The Board's Determination That TNS Did Not Provide Adequate
   Documentation To Support Its Incentive Compensation Awards Was
   <u>Not Arbitrary, Capricious, Contrary To Law Or An Abuse Of Discretion</u>

The Cost Principles provide that costs must "[b]e adequately documented . . . in order to be allowable under Federal awards." 45 C.F.R. § 75.403(g). As noted above, the 2007 Policy requires that, in order "[t]o be eligible to receive incentive compensation, employees must not

have received verbal or written performance warnings within 90 days of the payment of the

incentive," and that, "[f]or employees that have been with TNS more than one year, a current

employee evaluation with a satisfactory evaluation must be on file."  (J.A. 136).  For the same

reasons set forth in Section III.B above, it was not arbitrary, capricious, contrary to law or an

abuse of discretion for the Board to require TNS to produce the employee evaluations that the

2007 Policy required it to keep on file in order to substantiate its incentive compensation awards.

Likewise, for the reasons set forth above, it was not arbitrary, capricious, contrary to law or an

abuse of discretion for the Board to require TNS to produce records demonstrating that

employees who had received incentive compensation awards during the subject years had not

received a performance warning within 90 days of receiving such payment.

TNS argues that the Board's decision disregarded its own past holdings interpreting the

Cost Principles.  (Pl.'s Br. at 15-16).  In support, TNS cites *Seaford Cmty. Action Agency*, DAB

No. 1433, 1993 WL 742548, at *4 (1993), where the production of "payroll registers, minutes of

Policy Council meetings, evaluation sheets, and lists of awardees" was deemed sufficient to

demonstrate that the grantee had "an organization-wide salary supplement program in effect."

TNS claims that the documentation it provided to the Board here "was no different than that

approved by the [Board] in *Seaford*," and that it "had no way to ascertain that [the Board] would

require more specific documentation here than it had done in the past when considering a similar

incentive compensation system."  (Pl.'s Br. at 17).  As Defendant points out, however, *Seaford*

did not involve a situation where, as here, the record demonstrated that the organization failed to

make the challenged payments in accordance with the requirements of its own established plan,

as is required by 45 C.F.R. § 75.430(f).[12]  The court therefore finds that the Board did not deviate

from established precedent in finding that TNS failed to adequately document the incentive

compensation awards at issue in this litigation.

> D. The Board's Determination That TNS Failed To Show That
>    Its Incentive Compensation Awards Were Reasonable Was Not
>    Arbitrary, Capricious, Contrary To Law Or An Abuse Of Discretion

Under the Cost Principles, incentive compensation "is allowable to the extent that the

overall compensation is determined to be reasonable."  45 C.F.R. § 75.430(f); *see also id.*

§ 75.403(a) (costs must "[b]e necessary and reasonable for the performance of the Federal award

. . . in order to be allowable under Federal awards").  The Cost Principles provide that a "cost is

reasonable if, in its nature and amount, it does not exceed that which would be incurred by a

prudent person under the circumstances prevailing at the time the decision was made to incur the

cost."  *Id.* § 75.404.  The Cost Principles further dictate that consideration must be given to the

following factors, among others, in determining the reasonableness of a given cost:

- "Whether the cost is of a type generally recognized as ordinary and necessary for the operation of the [organization] or the proper and efficient performance of the Federal award";

- "Market prices for comparable . . . services for the geographic area";

- "Whether the individuals concerned acted with prudence in the circumstances considering their responsibilities"; and

---

[12] TNS also contends, as part of its challenge to the Board's finding that TNS failed to properly document the basis for its incentive compensation awards, that a "plain reading" of 45 C.F.R. § 75.430(f) "is that the organization must only show that it followed its 'established plan' in awarding incentive compensation." (Pl.'s Br. at 18).  But TNS ignores the regulation's requirement that an organization must show that it followed its "established plan . . . so consistently as to imply, in effect, an agreement to make such payment."  45 C.F.R. § 75.430(f). For the reasons cited in Section III.B above, TNS has failed to make such a showing.  Moreover, TNS also ignores the fact that section 75.430(f) also requires that incentive compensation must be reasonable, and that other sections of the Cost Principles require that any cost under a federal award be adequately documented.  *See id.* § 75.403(g).

- "Whether the [organization] significantly deviates from its established practices and policies regarding the incurrence of costs."

*Id.*

In support of its determination that TNS's incentive compensation awards were unreasonable, the Board found the following:

- TNS's "incentive compensation payments were 9.35% of its total salary costs for FY 2010, 12.19% of its total salary costs for FY 2011, and 6.99% of its total salary costs for FY 2012," and TNS had not proffered any evidence that those percentages were reasonable (J.A. 9);

- One of TNS's management employees received incentive compensation awards amounting to almost 50% of her salary from FY 2010 through FY 2012 (*id.*);

- In FY 2011, ten out of TNS's twelve management employees received incentive compensation awards in excess of 10% of their salaries (*id.*);

- TNS's Executive Director received incentive compensation awards ranging from 8.10% to 29.49% of his salary (*id.*);

- TNS "consistently gave larger incentive compensation awards to management employees than to non-management employees" (J.A. 11); and

- TNS "consistently gave different incentive compensation awards, both in terms of actual money awarded and in terms of the award as a percentage of an employee's annual salary, to employees who received the same ratings, and at times gave more generous awards to employees with lower ratings" (*id.*).

The Board concluded that a "prudent person would not determine incentive awards in what appears to be an arbitrary manner." (*Id.*).

TNS argues that the Board failed to articulate a satisfactory explanation for its finding of unreasonableness. (Pl.'s Br. at 22). It also contends that the Board improperly rejected its evidence supporting the reasonableness of the challenged incentive compensation awards – namely, that "its payment of incentive compensation did not cause total salaries to exceed the federal Executive II cap" and "that its salary rates were in line with [a] wage comparability study" prepared for it in 2009. (*Id.* at 25). TNS asserts that absent any further showing from

Defendant "beyond mere facial claims of unreasonableness," its evidentiary showing has sufficiently rebutted Defendant's "initial baseless finding, especially given that finding was seemingly based on nothing more than the agency's 'gut feeling.'"  (*Id.*).

As noted above, however, "[o]nce a cost is questioned as lacking documentation, the grantee bears the burden to document, with records supported by source documentation, that the costs were actually incurred and represent allowable costs, allocable to the grant."  *Northstar*, 2003 WL 21801698, at *3 (citations omitted).  Because a cost must be reasonable in order to be allowable, *see* 45 C.F.R. §§ 75.403(a), 75.430(f), TNS bore the burden of showing that the challenged incentive compensation payments were, in fact, reasonable.  The Board determined that TNS failed to carry its burden because, for all the reasons noted above, it failed to explain why it "determine[d] incentive awards in what appears to be an arbitrary manner."  (J.A. 11). This finding is far from a "mere facial claim[] of unreasonableness" (Pl.'s Br. at 25), and nothing in the administrative record indicates that it was arbitrary, capricious, contrary to law or an abuse of discretion.

Moreover, merely pointing to the fact that the challenged incentive compensation did not cause total salaries to exceed Level II Executive cap does not establish the reasonableness of those payments because, as the Board held, "TNS did not provide any evidence that Level II Executive positions were comparable to its management positions in terms of duties and responsibilities and geographic area."  (J.A. 9-10).  Similarly, the mere fact that total salaries were in line with TNS's wage comparability study does not establish the reasonableness of the challenged incentive compensation awards because, as the Board found, the study "discusses only base compensation and does not directly address bonuses or other incentive compensation awards."  (J.A. 10).  Moreover, the court agrees with the Board that the fact that an employee's

"total compensation in a given year did not exceed the maximum in the wage comparison study does not establish that . . . any incentive compensation award received as part of that total amount . . . is reasonable for any particular employee." (*Id.*).  TNS fails to cite anything in the administrative record demonstrating that these findings were arbitrary, capricious, contrary to law or an abuse of discretion.  Furthermore, nothing in TNS's arguments regarding the Level II cap and its wage comparability study comes close to explaining how or why it "determine[d] incentive awards in what appears to be an arbitrary manner," as discussed above.  (J.A. 11).

The court also notes that the Cost Principles mandate consideration of whether an organization "significantly deviates from its established practices and policies regarding the incurrence of costs" in determining whether the costs were reasonable.  45 C.F.R. § 75.404(e).  Accordingly, the court's finding at Section III.B above affirming the Board's determination that TNS failed to follow its 2007 Policy and 2009 Plan also supports affirming the Board's finding of unreasonableness.

For these reasons, the court finds that the Board did not abuse its discretion or act arbitrarily, capriciously or contrary to law in finding that TNS failed to demonstrate that the challenged incentive compensation awards were reasonable.

E.   Defendant Did Not Abuse Its Discretion Or Act Arbitrarily, Capriciously Or Contrary To Law In Failing To Differentiate Between Proper And Improper Incentive Compensation Awards During The Fiscal Years In Question

TNS argues that "[t]o the extent that some [of] the incentive compensation payments charged to [its] grant funds were made properly, while others were not, [the Board] incorrectly disallowed all incentive payments for the three fiscal years in question rather than remanding . . . to differentiate proper payments from those that should have been disallowed."  (Pl.'s Br. at 26).  But, as Defendant points out (*see* Def.'s Br. at 24-25), the Board determined that TNS failed to establish that ***any*** of its FY 2010, FY 2011 or FY 2012 incentive compensation awards were

"reasonable, supported by adequate documentation, and made pursuant to a pre-existing agreement or established plan." (J.A. 3). Under the Cost Principles, the 2007 Policy and the 2009 Plan, incentive compensation awards must meet all three of these requirements to be allowable. For the reasons set forth above, the court finds that TNS has not established that any of the Board's determinations as to any of these three requirements was arbitrary, capricious, contrary to law or an abuse of discretion.

Additionally, as is also noted above, TNS's argument ignores the fact that the facial inconsistencies in its incentive compensation awards through all three of the subject years demonstrate that it did not make the awards pursuant to an established plan that it followed "so consistently as to imply, in effect, an agreement to make such payment." 45 C.F.R. § 75.430(f). Therefore, the court finds that it was not arbitrary, capricious, contrary to law or an abuse of discretion for the Board to determine that the awards, *as a whole*, violated the Cost Principles. Moreover, as discussed above, TNS was on notice as to the basis for the Board's decision, and had ample opportunity to provide documentation supporting the challenged awards – including documents supporting the reasonableness of those payments and demonstrating their adherence to the 2007 Policy and 2009 Plan. The Board did not abuse its discretion or act arbitrarily, capriciously, or contrary to law in finding that TNS failed to take advantage of that opportunity.

Because TNS has not established the validity of any of its challenged incentive compensation awards, TNS cannot establish that the Board abused its discretion or acted arbitrarily, capriciously or contrary to law in disallowing the incentive compensation awards in their entirety rather than disallowing only certain of those payments while permitting certain other payments.

**IV.     CONCLUSION**

For the reasons set forth above, TNS's motion is hereby **DENIED** and Defendant's

cross-motion is hereby **GRANTED.**

An appropriate Order accompanies this Memorandum Opinion.


Date:  March 28, 2016


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge